## DAVIS v. TEXAS CONST. CO. et al.
### No. 1365.

Court of Appeal of Louisiana. First Circuit.
Oct. 3, 1934.

Hawkins & Pickrel, of Lake Charles, for appellant.

Alvin R. Christovich, of New Orleans, for appellee.

MOUTON, Judge.

Plaintiff alleging that he was injured on July 23, 1931, while rendering services as an employee of defendant company, sues defendant for compensation under the Employers' Liability Act (Act No. 20 of 1914, as amended).

Judgment was rendered below rejecting his demand, from which he appeals.

Plaintiff avers that while assisting as an acetylene welder in the installation of a natural gas distributing system in the town of Youngsville by defendant company, a joint or section of pipe flew up, striking him on the face, nose, and forehead, causing his total disability from doing work of any reasonable character.

In his petition the specific allegation is made that he suffered a "permanent subluxation of the Atlas and Axis, and a fracture or displacement of the interior tubercle of the Atlas."

In its answer, defendant company admits that plaintiff was injured on July 23, 1931, but denies the severity of the injury, as alleged by plaintiff, and avers that it was "slight."

Dr. R. W. Fuller of Beaumont took an X-ray picture of plaintiff for the purpose of ascertaining the nature of his injury. According to his testimony, the picture so taken shows a "very pronounced subluxation of Atlas and Axis," meaning, as we understand, a strain which causes a pressure on the nerves that go to the cranial vault.

Dr. Bordelon of Lake Charles, from his examination of the picture taken by Dr. Fuller, found that it showed the subluxation of the atlas and axis, as is testified to by Dr. Fuller.

Some time after this picture was taken by Dr. Fuller, Dr. McKinney of Lake Charles, a radiologist, took an X-ray picture of plaintiff.

Drs. McKinney and Watkins, experts for defendant, say that the picture taken by Dr. McKinney shows no such subluxation of the atlas and axis.

In this respect there is a sharp conflict in the testimony of these experts, two testifying for plaintiff and two for defendant.

The district judge found that there was an irreconcilable difference in the findings of these experts, and said that he had therefore to resort to the other evidence in the record for a proper solution of the case.

Reference is made by defendant to the fact that Dr. Fuller is not a regular physician or surgeon but is a chiropractor, and that X-ray pictures taken by him are not reliable, as are those of Dr. McKinney, a physician and radiologist.

Dr. McKinney says, to acquire knowledge of radiology, a person should have training and experience.

Dr. Fuller testifies that he is a graduate of the school of chiropractice of Davenport, Iowa, and that he took a special course for six months or more in the art of taking X-ray pictures, that he has taken thousands of these pictures, and that he is qualified as an expert in that line of work. It is not stated by Dr. McKinney that to become such an expert it is necessary to be a regular physician or surgeon.

This question is, however, of no importance as we agree with the district judge in holding that the testimony of these experts could not be harmonized on the issue as to whether there was a subluxation of the atlas and axis.

Plaintiff produced Drs. Bordelon, Dewell, and Ferguson, regular physicians, who appeared as medical experts in his behalf. Each of these physicians made an actual physical examination of plaintiff.

Dr. Bordelon found that plaintiff was "totally and permanently disabled."

Dr. Ferguson being asked if he thought plaintiff could pursue any kind of ordinary occupation, answered as follows: "I doubt very much whether he could do anything. He is very nervous, and I understand he has expressed an intention of killing himself two or three times."

Dr. Sewell's report shows that he found him "incapacitated from any work that requires unusual physical activities," and there can be no doubt that a welder must often exercise unusual physical activity, as the evidence shows that frequently, in welding pipes in the installation of these gas plants, he is required to stoop down in ditches with his feet almost perpendicularly above his head.

Dr. Fuller, who also made a physical examination of plaintiff, says he is of the opinion that his disability is permanent and that he would not be able to do manual labor in the future, unless he receives very successful treatment.

A physical examination was also made of plaintiff by Drs. Watkins and McKinney, experts for defendant company, who say that he was not suffering with disability from doing ordinary work. Hence, the opinions of these two experts is again in conflict with the findings of the three physicians who testified for plaintiff and the finding of Dr. Fuller, the chiropractor.

We will not attempt to pass on the difference of opinion of the experts involving the question, as to whether there was a subluxation of the atlas and axis, as such an issue is purely medical and beyond our power of analysis.

The question of the physical disability of the plaintiff presents, however, an issue of a different character, and not dependent exclusively on the opinion of medical experts.

■ To determine whether plaintiff was physically disabled, it is proper for the court to resort to the evidence of the laymen who testified in the case, which may properly be analyzed in connection with the testimony of the medical experts, although from the disability which followed the injury, it would seem that there was such a subluxation, or else that it was due to some other cause to which reference will be made later in this opinion.

Following this line of analysis, we shall first consider the nature of the injury plaintiff alleges he suffered, which defendant com-

674

pany avers was "slight," as appears in its answer.

Mr. Labbe, a resident of Lafayette parish, was one of the "gang" laying the pipe when the accident occurred and was next to plaintiff at the time. He testifies that the pipe was being bent over the ditch; that four of the employees were holding that pipe down; that they stepped off the pipe which flew up and struck plaintiff, which the record shows was on the nose between the eyes and on the forehead. Mr. Labbe says plaintiff was knocked back about 8 or 10 feet on the ground; that they picked him up; and that two men, one on each side, took him to Dr. Comeaux of Youngsville, who was then about 170 feet from the spot where the accident occurred, sitting on his gallery.

One of the men who took plaintiff to Dr. Comeaux was Mr. Bob Fulner or Fulman, the foreman of defendant company, who had charge of these employees, including plaintiff.

Mr. Labbe says that plaintiff was leaning over the pipe at a distance of about 30 or 36 inches when it flew up and struck him in the face. Mr. Labbe says he wiped the blood from plaintiff's face as they walked towards Dr. Comeaux' office.

The record shows that plaintiff was struck by a two-inch steel pipe.

Mr. Labbe is not a relative of plaintiff, and in answer to a question propounded by counsel for defendant unhesitatingly stated he had no interest whatsoever in the outcome of this suit.

The district judge, in his written opinion, in referring to Mr. Labbe, as a witness, says, "He bore all the marks of disinterestedness," and we have no doubt that Mr. Labbe testified to what he actually saw and that no one was in a better position than he was to see what had really occurred.

Mr. Bowels, plaintiff's witness, says he was working on the job when plaintiff was injured but was about a block away and did not see when he was struck; but a little while after, he saw the bandage which Dr. Comeaux had placed across plaintiff's nose.

This statement of Mr. Bowels that he was a block away and had not seen the accident shows he was testifying to what he saw and indicates he was not inclined to assist plaintiff in making any false statement.

Plaintiff's testimony in reference to the way he was injured is substantially in accord with the evidence of Mr. Labbe. Plaintiff says, however, that he was knocked unconscious but could not say for what length of time he remained in that condition after he received the blow.

The character of the blow, as described by Mr. Labbe, could certainly have caused unconsciousness temporarily, and we do not see why plaintiff should not be believed when he says he was knocked unconscious.

Dr. Comeaux says he was standing on his porch "about 170 or 200 feet" from where plaintiff was struck and was looking at the "gang" of workmen. He testifies that he saw plaintiff step backwards but did not see him fall to the ground. He admits that in the crowd of men working there, it might have happened that he did not see plaintiff fall on the ground. He does not remember if plaintiff told him he was suffering with pains in the head. He does not remember if plaintiff was assisted or not when he came to his office. He testifies he had a record of the occurrence but could not find it, and testified in the case about two years after the accident, according to his testimony.

Evidently, Dr. Comeaux was casually looking towards this group of employees when plaintiff was struck. At the distance he was, it is obvious that he did not see when plaintiff fell to the ground and was picked up by Mr. Labbe and his coemployees.

The court below found that Mr. Labbe was a truthful witness and we have no hesitancy in indorsing that conclusion. If Mr. Labbe's testimony is true, so must be the evidence of plaintiff which is practically to the same effect; hence we must conclude that plaintiff was knocked some 8 or 10 feet from where he was struck and fell on the ground from where he was picked up by his fellow employees; also, that he was assisted in going to Dr. Comeaux' office by Mr. Labbe and Mr. Fulman, the foreman of defendant company.

If the accident did not happen as stated by Mr. Labbe, why was not Mr. Fulman, the foreman for the company, or one or more of the "gang," called as a witness or witnesses to contradict Mr. Labbe? Mr. Labbe had been summoned as a witness by plaintiff, and defendant should have been ready with its witnesses who were present when plaintiff was injured.

Mr. Holcombe, pay-roll clerk of defendant company, was sworn as a witness by defendant. In answer to a question by counsel for defendant, he said he did not know if defendant had made an effort to locate Mr. Fulman, the foreman of defendant company. He said to the best of his knowledge he had not

tried to locate Mr. Fulman, but he thought he might be able to locate foremen of defendant company, which evidently included Mr. Fulman, the foreman in question.

It is impossible to believe that some of the employees who were working under this foreman when the accident occurred could not also have been located by defendant and brought into court to testify in this case. The defendant company evidently knew that Mr. Labbe would testify in behalf of plaintiff and cannot reasonably claim that it was taken by surprise on hearing his testimony, which could have been contradicted by the testimony of Mr. Fulman, or some other of the employees, if the testimony of Mr. Labbe was untrue. If defendant was taken by surprise, it is indeed singular that counsel representing defendant should not have applied for time to have the foreman or some of the employees of that group of workmen testify in the case. If a motion to that effect had been submitted to the court, no doubt, the relief would have been granted. The defendant company having failed to produce the foreman as a witness or some other of the group referred to, it must be concluded that it entertained no hope of contradicting the testimony of Mr. Labbe, and that of plaintiff, on the subject under discussion.

After attending to the wounds plaintiff had suffered, Dr. Comeaux told plaintiff in six or seven days he could return to work. Upon returning to take up his job, at about the time he was advised by the doctor, it appears, as testified to by plaintiff, that the foreman, Mr. Fulman, asked him if he did not know that if he had stayed away another day, he would have been entitled to compensation. Plaintiff paid no heed to this statement and went to work for the defendant company.

This conduct of plaintiff in declining to wait only an additional day to claim compensation indicates that he thought he would soon get well, as advised by Dr. Comeaux, and for that reason, it is reasonable to say, took up his job.

Mr. Labbe testifies that when plaintiff came back to his work at Jeanerette where the defendant was engaged in some work at that time, he was given light work, that his co-employees would do his heavy work, at times, sometimes he would do this heavy work, and at others would not work at all, for a couple of days. The light work referred to means roll-welding job, which required no stooping.

Plaintiff testifies that in Jeanerette he worked about eight days and that according to an understanding he had with the foreman, Mr. Bowels, a colaborer, was to do his heavy work. This statement is confirmed by Mr. Bowels, who testifies that he took up plaintiff's heavy work at the request of the foreman.

Mr. Labbe, who was referred to by the district judge as a disinterested witness and who was no doubt credible in the opinion of the court, says that plaintiff while on the job in Jeanerette was doing light work. Mr. Labbe did not testify that this light work assigned to plaintiff was the result of an arrangement with the foreman. This, as the evidence of Mr. Bowels and plaintiff shows, came by way of an understanding between them and the foreman of which Mr. Labbe in all probabilities was not aware, and if he knew that such an agreement had been entered into, not being questioned about it, he did not refer to it in his testimony.

Later, plaintiff worked for defendant company at Lake Charles. Mr. Bowels was there on the job with plaintiff, but not Mr. Labbe.

Plaintiff testifies that at Lake Charles, as he had been doing in Jeanerette, he was attending to light work as roll-welder and that Bowels was doing his heavy work, and Bowels so testifies. This, according to their testimony, was with the consent of the foreman of defendant company.

Mr. Bowels, testifying on this subject, in referring to plaintiff, says: "Mr. Foreman would tell him to go in."

"Question. Go in where?

"Answer. To the hotel, if he wouldn't feel like he could stay on the job and that would take care of him."

Plaintiff accepted full pay from the company as a welder although he was performing only light work at Lake Charles. He explains that Mr. Bowels was doing his heavy work and in that manner accounts for his acceptance of the checks for regular pay as a welder. With the arrangement that had been made with the foreman, it is reasonable to conclude that the defendant company was sending these checks knowing that plaintiff was not performing the full work required of a welder.

If defendant company was taken by surprise at these disclosures about the conduct of its foreman, why is it that no effort, not even a suggestion, was made by defendant for time to get the testimony of this foreman? No doubt, time would have been granted by the district judge, and if it had been refused, this court would be in a position

to review that issue. As the case stands, there is no good reason that can be advanced to authorize us to discard the evidence of these two witnesses, above referred to.

It is shown by the testimony of Mr. Labbe that plaintiff was doing light work in Jeanerette most of the time and which must have been with the knowledge of the foreman. There is nothing strange in the fact that he continued to do similar work at Lake Charles and with the consent of the foreman. Such being the situation, we are of the opinion that these two witnesses told the truth as to what occurred at Lake Charles, as revealed in their evidence.

It is therefore shown that plaintiff could not do the work of a welder except partially and to the knowledge of defendant company.

Referring to the case of French v. Weaver Bros., 18 La. App. 174, 137 So. 758, the lower court in its opinion says:

"It has been held that where the proof shows wages after an injury to be equal to those received before an injury, the employee cannot recover compensation for partial disability."

In this case, there is no demand for partial disability, and besides in the case above cited the court said that subsequent to the injury plaintiff performed his work as he had previously and made no claim in his testimony that he was unable to do the work. In this case, the foreman knew plaintiff could not do his work, but the defendant, however, paid him in full.

The above-cited case is entirely different and does not apply.

It must therefore be held that plaintiff was seriously injured and was incapacitated from rendering his usual services.

After working in Lake Charles for defendant, plaintiff went to Jeanerette where he left equipments belonging to defendant and drove an automobile to Hattiesburg, Miss., to take up work as a welder. He testifies he was to work for a man whose name he believes was Mulby and to whom he had wired. He admits that he was to get $1 an hour for the usual work required of a welder. The morning after he arrived at Hattiesburg, he testifies that he started to work for Mr. Mulby, made a couple of bill holes, became dizzy, suffered pains, and had to quit after working about two or three hours. He says he could not remember the name of the foreman under whom he had worked for Mr. Mulby. Having worked there only two or three hours, it is not surprising that he did not remember the name of the foreman.

It is somewhat strange, it may be said, that plaintiff should have undertaken to do the heavy and light work of a welder if he was really incapacitated from rendering such services at the time. Plaintiff had been told by Dr. Comeaux that he would soon recover and no doubt believed that he would. This appears from the fact that when he returned to work at Jeanerette, though advised by the foreman that absence from work one day more would entitle him to compensation, still he went back to his job at a time when he evidently thought he would be required to perform all the work of a welder, light and heavy. Thereafter, at Jeanerette and Lake Charles, he was employed mostly in light work and had rested from his heavier duties when he drove to Hattiesburg to work as a welder.

Plaintiff was then only 26 years of age, had always been an industrious laborer as appears from the record, and eager to work. This, we think, accounts for his engagement with Mr. Mulby at Hattiesburg. Unquestionably, he realized at Hattiesburg that he could not do the work of a welder and that under Mr. Mulby he could not expect to have only to do light work, leaving to some other employee the services required for the heavy work. From Hattiesburg, he went to Beaumont, Tex., where his brother and sister were living and who were supporting him when this suit was filed.

He testifies that he consulted about eighteen physicians in reference to his ailment, including Dr. Fuller, the chiropractor, and failed to get relief. It is true that he produced only three physicians and Dr. Fuller, as experts he had consulted in reference to his trouble. It seems that he did not remember the names of all the physicians he had consulted, and we do not think his testimony should be questioned because he relied to establish his claim of disability on the evidence of the medical experts he produced as witnesses.

In connection with his evidence in this respect, it is appropriate to refer to the testimony of Mr. Bowels, also a resident of Beaumont, wherein he says that on many occasions he took plaintiff to physicians, and sometimes at night, for relief from his intense suffering, and that at times plaintiff was "crying" when he made these calls for relief. It is true that Mr. Bowels was plaintiff's friend, but it could not be expected that such complaints could be made to others

than friends or relatives, and that plaintiff should have appealed to strangers for assistance.

Plaintiff is certainly not a malingerer and the real issue is as to whether the blow was of a character to produce total disability.

Dr. Watkins, testifying from his examination of plaintiff, says there was no indication that he had received a severe blow.

Plaintiff, as we have stated in the beginning of this opinion, was struck across the nose and forehead by this two-inch pipe, was knocked backwards about eight or ten feet, and according to his testimony, he fell flat on his back unconscious in the middle of the roadway. This was not only a severe but was a terrific blow, and however learned a physician may be in his profession, he cannot, more than can a layman, make an accurate estimate of the force behind such a blow. It is not unreasonable to say that the gravest and most serious consequences could result to a man's mind and body from such an accident.

Contrary to the expert evidence of the plaintiff, Drs. Watkins and McKinney, testifying for defendant, said that there had been no subluxation of the atlas and axis, an issue which we have eliminated as a pure medical proposition from consideration because of the conflict in the opinion of these experts on that question, as heretofore stated, except in so far as the evidence of the laymen, taken in connection with the expert testimony, supports the conclusion arrived at by the experts testifying for plaintiff.

In giving his testimony, Dr. Watkins said there were several muscles attached to the atlas and axis, which if detached or displaced would cause permanent pain in the neck and would not appear in an X-ray picture.

Dr. McKinney, testifying on this subject, said these muscles when detached or torn loose will occasionally cause disability but would not be reflected or revealed in an X-ray picture and hence he could not say, in the instant case, if these muscles had been so affected.

With testimony of that character from the medical experts of defendant company, it is logical to hold that although some of these muscles connected to the atlas and axis might have been detached or torn, nothing of that character appeared in the pictures taken by Dr. McKinney and which, however, could have caused the disability complained of.

We are of the opinion that the whole history of the case supports the conclusions reached by the experts who testified for plaintiff.

The proof shows that plaintiff always complained, from the time he was injured, of a pain in the side or back of his head. This complaint of pain in his head, Dr. Ferguson says, is the "most outstanding thing," these aches and pains. Such a fact, it is evident, this expert considered as the strongest proof that the blow plaintiff had suffered had caused total disability.

It also clearly appears that plaintiff had never suffered any accident during his lifetime prior to the accident in question, with the exception of a slight injury to one of his eyes, when a child of seven years. There is not the remotest evidence showing that he was injured in any way after receiving the blow which brought on this complaint. Such being the situation, the only possible conclusion is that his disability was brought about by the blow he received July 23, 1931.

In a recent decision, we took occasion to say that we should not depart from the rule which requires claimants in compensation suits to prove their cases with legal certainty, otherwise they would rarely fail from recovering judgment for their alleged injuries.

It is with due regard to that rule that we have reviewed this case.

In the record, we find a carefully written opinion by our learned brother of the district court, based almost entirely on questions of fact, which accounts for the almost unpardonably lengthy review in this opinion, and which has resulted in conclusions opposite to those reached below. After a scrupulous consideration of this record, we find that plaintiff has made out his case with all the certainty required by law; that the lower court has fallen into a manifest error; and that the judgment must be reversed and a decree entered in favor of plaintiff.

It is therefore ordered, adjudged and decreed that the judgment appealed from be annulled, avoided, and reversed; and it is further ordered and decreed that plaintiff have judgment against defendant the Texas Construction Company for the sum of $20 per week for the period of his disability, not to exceed four hundred weeks, from August 31, 1931, when he ceased working for defendant company with 5 per cent. per annum on every installment from its respective maturity until paid; and that defendant company pay all costs of this suit.

LE BLANC, J., dissents.